STATE, EX REL. P. R. HALLIGAN, COUNTY ATTORNEY, APPELLANT, V. M. P. CLARY ET AL., APPELLEES.

FILED NOVEMBER 17, 1916. No. 19045.

Counties: CHANGE OF BOUNDARIES. Where it has been attempted to change the county boundary of an unorganized county by a void act of the legislature, and the adjoining county has taken over that portion of territory excluded by the void act, and has exercised jurisdiction over such territory for many years without any attempt being made to prevent it, has levied and collected taxes thereon, organized voting precincts where the votes of the inhabitants have been cast and counted by its officers, organized school districts and conducted schools since its organization, has exercised all of the functions of county government within the disputed strip, and the state government has recognized the line fixed by the void act for more than ten years, the court, in the exercise of sound public policy, will refuse to change such boundary line.

APPEAL from the district court for Garden county: RALPH W. HOBART, JUDGE. *Affirmed.*

*Wilcox & Halligan* and *P. R. Halligan,* for appellant.

*H. J. Curtis, F. E. Williams* and *R. F. Williams,* contra.

BARNES, J.

This is an appeal from the judgment of the district court for Garden county in a proceeding in *quo war-*

*ranto* by which the county attorney of Arthur county sought to have the state oust the officers of Garden county from exercising jurisdiction over a strip of land lying between the twenty-fifth degree of longitude west from Washington and the range line between ranges 40 and 41 west of the sixth P. M., which the legislature of 1895 (Laws 1895, ch. 23) defined as the west line of Arthur county, said strip of land being about 3 miles in width and 24 miles long. The trial court found for the defendants and dismissed the proceeding. The plaintiff has brought the case to this court for review.

Appellant contends that the district court erred in the holding that the boundary line between Garden county and Arthur county was the range line between ranges 40 and 41 west of the sixth P. M. This contention is based largely on the proposition that the legislative act of 1895 defining the boundaries of Arthur county is unconstitutional. The fact that the act of 1895 was a void act may be conceded; but, notwithstanding that fact, it appears that in 1887 the legislature passed an act creating Arthur county and defining its boundaries. At that time Arthur county was unorganized territory, and was attached to McPherson county for election, judicial and revenue purposes. On the 16th day of August, 1913, Arthur county was duly organized under the provisions of an act passed by the legislature of that year. The record shows that in 1888 Deuel county was created out of the east part of Cheyenne county, and the twenty-fifth degree of longitude west from Washington was defined as the east boundary line of Cheyenne county. It further appears that at that time the twenty-fifth degree of longitude west from Washington had not been surveyed, marked out, or established upon the ground, but the range line between 40 and 41 was thought to be such meridian line. Garden county was formed out of the east part of Deuel county, and, at the time Arthur county was created and

its boundary defined, the twenty-fifth degree of longitude
west from Washington was an unknown and imaginary
line. No attempt was made by anyone to have it sur-
veyed, determined and marked upon the ground until
about the year 1912, when the county of McPherson, to
which Arthur county had been attached for revenue,
judicial and election purposes, caused the survey to
be made and marked by monuments, which survey es-
tablished the location of the twenty-fifth degree of long-
itude west from Washington. At the time McPherson
county had the twenty-fifth degree surveyed and marked,
it claimed to embrace within its own boundaries the en-
tire county of Arthur as a part and parcel of itself, and
the monuments placed to indicate the exact location of that
line upon the face of the earth were marked on the west
side of the unorganized territory attached to McPherson
county. This survey was made at the instance of Mc-
Pherson county, and that county furnished the monu-
ments. That was the first step by the state, or any one,
to establish and mark the twenty-fifth degree of long-
itude upon the face of the earth, and was taken in April,
1912, 17 years after the passage of the act of 1895, and
24 years after Arthur county was created by the legisla-
ture and its boundaries defined. Before this line was
surveyed and marked, no person traveling westward
through Arthur county could tell where that county
ceased and Cheyenne, Deuel and Garden counties, in
their succession, began, and, while that knowledge was
wanting, the legislature, in 1895, sought to remedy the
difficulty by redefining and fixing the west line of Arthur
county as the line between ranges 40 and 41 west of the
sixth P. M., and, whether the act was legal or not, it was
sensible and practical, and a recognition by one of the co-
ordinate branches of the state government of that line as
the west boundary line of Arthur county and the east
boundary line of Deuel county. After the passage of the
act of 1895 the state recognized the range line as the west
line of Arthur county and the east boundary of Cheyenne,

Deuel and Garden counties. This is evidenced by the fact that the department of public lands and buildings caused the state school lands within the strip to be surveyed, and caused the commissioners of Deuel county to appraise those lands for rental purposes. On August 9, 1899, section 36, in township 17, range 41, was leased, and this lease was transferred to L. F. Fairchilds on November 16, 1908, according to the transcript of the records of Deuel county made for Garden county after its organization. The record of that section of school lands also applies to section 36, township 18, range 41, and section 36, township 19, range 41, and section 36, township 20, range 41, which were leased, and the rentals on the leases were paid in Garden county after its organization and remitted to the commissioner of public lands and buildings. These school lands were reappraised by the board of commissioners of Deuel· county, and the appraisement returned to the commissioner of public lands and buildings in November, 1907. When the legislature passed the act of 1895, it recognized the range line as the boundary line between these counties, and every time the legislature has spoken upon the question since that time it has given recognition to it as the boundary line. Again, the commission created by the legislature of 1911 to revise the laws of Nebraska recognized the range line as the boundary line in its report upon revision of the laws, and the legislature in adopting the report approved that recognition. The persons authorized to compile the statutes recognized the act of 1895 as giving the true west boundary of Arthur county, and every volume of the statutes compiled and annotated since 1895 will show that fact. The state treasurer has accepted from Garden county state taxes assessed against property on the strip of land in controversy. The state auditor has certified to the clerk of Garden county each year the lands in the disputed strip which have become subject to patent and thereby taxable. In fact, there is no evidence that the state, or any officer of the state, ever in any way recog-

nized either McPherson or Arthur county as having any jurisdiction over the territory in question.

Conceding the act of 1895 to have been unconstitutional, it appears that it was for years treated as a valid act, and Garden county, under color of law, after its organization, proceeded to collect the taxes assessed against the inhabitants residing on the strip of land in controversy. School districts have been organized and schools conducted thereon as school districts of Garden county; deeds, contracts and mortgages given to and by the inhabitants residing on the strip have been recorded in Garden county by the county officers; voting precincts have been organized and the votes cast by the residents on that strip have been returned to and counted by the public officers of Garden county. It would lead to needless expense and confusion and would be against public policy to now hold that the twenty-fifth degree of longitude west from Washington is the boundary line between Arthur and Garden counties. To so hold would dismember farms and place parts of them in different counties, and that without regard to section lines as established by government surveys, without any substantial benefit to the public or the inhabitants of Arthur county. It therefore seems clear that the district court did not err in its finding and judgment. *State v. McLean County,* 11 N. Dak. 356; *People v. Maynard,* 15 Mich. 463; *Jameson v. People,* 16 Ill. 257; *Rumsey v. People,* 19 N. Y. 41; High, Extraordinary Legal Remedies (3d ed.) sec. 686.

In *State v. City of Des Moines,* 96 Ia. 521, 31 L. R. A. 186, it was held that the equitable claim of a city to jurisdiction over territory which a void statute has declared to be annexed to it will not be disturbed at the instance of the state without any suggestion of anticipated benefits by so doing, where for more than four years the city has exercised authority over such territory.

In *People v. Alturas County,* 6 Idaho, 418, 44 L. R. A. 122, which was an action in *quo warranto* to exclude

State, ex rel. Halligan, v. Clary.

Blaine county from the exercise of municipal powers within the boundary fixed by the act creating such county, it was held that the people residing within the territory embraced within Blaine county having repeatedly recognized the existence of the county, held general elections therein, participated in by the electors generally, elected county and precinct officers, levied and collected taxes, assumed debts of its predecessors, funded a large indebtedness, brought suits as a county against other counties, and recovered large sums, and exercised all the powers and functions of a county government for a period of nearly four years, under such circumstances the court would decline to examine into the manner of the passage of the act creating the county.

It is therefore apparent that the trial court was not without authority for its findings and judgment, of which the appellant complains. It is true that the record discloses that some few persons residing on the disputed territory paid taxes to the authorities of McPherson county, and that sometimes the question of the jurisdiction of Arthur county over the territory in dispute was discussed; but the great weight of the testimony shows that nearly all the inhabitants residing on the disputed strip fully recognized the authority of Garden county over that territory.

We therefore conclude that the judgment of the district court was right, and it is in all things

AFFIRMED.

SEDGWICK, J., not participating.